**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF FLORIDA**
**TAMPA DIVISION**

| | |
|---|---|
| 3B MEDICAL, INC., a Florida Corporation, | **COMPLAINT** |
| Plaintiff, | |
| v. | **Jury Trial Demanded** |
| RESMED, INC. a Delaware Corporation, and RESMED CORP., a Minnesota Corporation, | |
| Defendants. | |

Plaintiff 3B Medical, Inc., ("3B Medical") alleges as follows:

**NATURE OF THE ACTION**

1.  3B Medical brings this action to prevent further foreclosure, foster competition, decrease prices, and preserve choice in the market for sleep apnea flow generators.  Sleep apnea flow generators supply air to masks worn by patients suffering from sleep apnea.  ResMed is a monopolist in the market for sleep apnea masks and has used its monopoly position in masks to achieve market power in the flow generator market.  Specifically, ResMed has entered and enforced exclusive or de facto exclusive contracts in which customers have been threatened with substantial price increases on masks unless they purchased all or virtually all (*e.g.*, 90%) of their masks and flow generator needs from ResMed.  ResMed audits customers' compliance with contracts through a practice known in the industry as "Clipboarding:" a ResMed representative

visits customer warehouses with a clipboard (for note taking) to assess whether a customer is purchasing competing products.  The effect of ResMed's coercive practices on 3B Medical is best described by a potential 3B Medical customer asked by a third-party analyst about 3B Medical's low-cost entry:  "We haven't tried 3B yet.  It's hard to switch to a low-cost provider because ResMed will shut down anyone who gets near their business."

2.  In addition to its contract practices, ResMed interfered with 3B Medical's actual and potential customers by using its sales force to make false and disparaging statements about 3B Medical.  For example, ResMed told customers that 3B Medical's flow generators had been, or would be, barred from importation, that 3B Medical would not stay in business as a result of expensive patent litigation (which cost more than $5 million to defend), and, thus, that 3B Medical would not remain in the market to service their flow generators or fulfill the products' two-year warranty.

3.  3B Medical brings this action under Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1 and 2, Section 3 of the Clayton Act, 15 U.S.C. § 14, the Florida Antitrust Act of 1980, Fla. Stat. §§ 542.18-19, and Florida statutory and common law.  3B Medical demands a jury trial pursuant to Rule 38 of the Federal Rules of Civil Procedure and seeks injunctive and monetary relief; threefold and punitive damages; pre- and post-judgment interest; the disgorgement of ResMed's ill-gotten profits; and its attorneys' fees and costs in bringing this action.

## PARTIES

4.  Plaintiff 3B Medical, Inc. is a corporation organized under the laws of Florida with its principal place of business in Lake Wales, Florida. 3B Medical imports and serves as the United

2

States distributor for BMC Medical Co., Ltd. ("BMC"), a Chinese corporation with its principal place of business in Beijing, China.

5.   Defendant ResMed, Inc. is a corporation organized under the laws of Delaware with its principal place of business in San Diego, California.

6.   Defendant ResMed Corp. is a corporation organized under the laws of Minnesota with its principal place of business in San Diego, California.

7.   ResMed Corp. is ResMed, Inc.'s direct and wholly-owned United States sales subsidiary. Upon information and belief, ResMed, Inc. and ResMed Corp. share common management, interrelation of operations, and centralized control of business decision-making. ResMed, Inc., through foreign subsidiaries, manufacturers its sleep apnea products primarily overseas. The United States-based ResMed entities import these products and distribute them throughout the United States.

8.   As used herein, "ResMed" refers collectively to the United States-based ResMed entities: ResMed, Inc. and ResMed Corp.

## JURISDICTION AND VENUE

9. This action arises under the federal antitrust statutes and the statutory and common law of Florida. The alleged violations affect interstate commerce, as ResMed operates in interstate commerce by contracting for the sale of medical equipment across state lines.

10. This Court has subject matter jurisdiction pursuant to Section 4(a) of the Clayton Act, 15, U.S.C. § 15(a), 28 U.S.C. §§ 1331 and 1337, and 28 U.S.C. § 1367(a).  3B Medical brings this action pursuant to Section 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15(a) and 26, to recover threefold damages, punitive damages, equitable relief, disgorgement of profits, costs of suit, and

reasonable attorneys' fees for ResMed's violations of Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1 and 2, Section 3 of the Clayton Act, 15 U.S.C. § 14, and Florida law.

11. The Court also has jurisdiction pursuant to 28 U.S.C. § 1332(a), as the matter in controversy exceeds the sum or value of $75,000 and is between citizens of different states.

12. This Court has personal jurisdiction over ResMed pursuant to 28 U.S.C. § 1391 and Section 12 of the Clayton Act, 15 U.S.C. § 22, because ResMed regularly does business in Florida.

13. In addition, this Court has jurisdiction pursuant to the Florida Long-Arm Statute, Fla. Stat. § 48.193, because ResMed (a) regularly does business in Florida, (b) has committed a tortious act against 3B Medical within Florida, (c) caused injury to 3B Medical through an act or omission outside of Florida while ResMed's products were used or consumed within Florida in the ordinary course of commerce, trade, or use, and/or (d) was engaged in substantial and not isolated activity within Florida.

14. Venue is proper in the United States District Court for the Middle District of Florida, Tampa Division, pursuant to Section 12 of the Clayton Act, 15 U.S.C. § 22, and 28 U.S.C. § 1391(b) because ResMed resides in this district, transacts business in this district, and because a substantial portion of the events giving rise to 3B Medical's claims occurred, and a substantial portion of the affected interstate trade and commerce described below has been carried out in this district.

## INDUSTRY OVERVIEW

15. Sleep apnea is a type of sleep disorder characterized by pauses in breathing or instances of shallow or infrequent breathing during sleep. Sleep apnea afflicts roughly 20% of adults ages

30 to 70.  Three types of sleep apnea exist:  (a) obstructive sleep apnea ("OSA"), in which air stops flowing to a patient's lungs because of a blockage (or obstruction) in his or her upper airway; (b) central sleep apnea ("CSA"), in which a patient's brain simply stops telling the body to breath; and (c) complex sleep apnea, which is a rarer form of sleep apnea that starts out as OSA.  Of patients who suffer from sleep apnea, roughly 85% have OSA, 15% of CSA, and 0.4% have complex sleep apnea.

16. Sleep apnea is a long-term condition that requires ongoing treatment.  Sleep apnea is treated using a mask and flow generator:  a person wears a sleep apnea mask while sleeping, which is connected to a flow generator that supplies air to the mask.  The sale and marketing of masks and flow generators in the United States requires Food and Drug Administration ("FDA") approval.

17. Physicians prescribe masks and flow generators to patients suffering from sleep apnea, and health insurers provide coverage for these products.  After obtaining a prescription, patients order sleep apnea masks and flow generators from durable medical equipment distributors ("DMEs") or national respiratory product companies ("National Accounts").  DMEs and National Accounts purchase masks and flow generators from suppliers (such as ResMed), ship the products to patients, collect co-payments from patients, and seek reimbursement of the remaining price from insurers.

18. Insurers reimburse DMEs and National Accounts for sleep apnea products that DMEs and National Accounts supply to patients covered by insurance policies.  DMEs and National Accounts have experienced substantial insurer cuts in reimbursement rates for sleep apnea products.  For example, at the beginning of 2013, the federal government announced an

approximate 47% cut in Medicare reimbursement rates for sleep apnea products.  Roughly 25% of the domestic sleep apnea patient population is covered by Medicare.  In light of such insurer reimbursement pressures on DMEs and National Accounts, competitive pricing by suppliers such as ResMed and 3B Medical for the sleep apnea products they sell to DMEs and National Accounts is critically important.  For example, if a DME receives a competitive price for a flow generator it purchases, it will be better positioned to withstand the federal government's reimbursement rate cuts.

19. Several thousand DMEs purchase sleep apnea equipment.  National Account purchases are dominated by two National Accounts, referred to in this complaint as "National Account #1" and "National Account #2."[1] These two National Accounts currently comprise roughly 40% of all flow generator purchases in the United States.

20. Patients must regularly replace sleep apnea masks and flow generators.  Under Medicare guidelines, a mask should be replaced once every three months, and flow generators should be replaced once every five years.  Thus, for every flow generator that a DME or National Account supplies to a patient, the organization will supply roughly 20 masks.

21. For two reasons, a patient tends not to switch the brand of a sleep apnea mask that he or she begins using.  First, physicians often prescribe a mask by brand name, and many state laws prevent a DME or National Account from fulfilling a prescription with a product other than the one specified in the prescription.  Second, each mask model/brand has a unique fit.  Once a patient is initially fitted with a specific mask model and brand, he or she develops a level of comfort with the mask and tends to use the brand of mask throughout his or her treatment.

---

[1] 3B Medical does not provide the actual names of these customers in order to protect their identities from public disclosure.

22. Such product standardization does not occur with flow generators.  Physicians rarely prescribe flow generators by brand name/product, and patients are not specifically fit with flow generators.  Flow generators supply air to sleep apnea masks through a connection tube.  The connection tubes have a standard size such that one competitor's flow generator can connect and be used with another competitor's mask. For example, a 3B Medical flow generator can connect with a ResMed mask.  Accordingly, a patient who uses a ResMed mask can also use a 3B Medical flow generator.

## RELEVANT MARKETS

23. The United States is the relevant geographic market in which to assess ResMed's conduct.

### *Sleep Apnea Mask Markets*

24. Masks for the treatment of sleep apnea is a relevant product market for assessing ResMed's conduct.  Sleep apnea masks include full-face masks, nasal masks, and nasal pillow masks.  Each of these types of masks can connect to flow generators, are approved by the FDA to be used with positive airway pressure therapy, and are marketed by competitors to physicians, DMEs, and National Accounts for the treatment of sleep apnea (primarily OSA).

25. The market for sleep apnea masks has substantial barriers to entry.  FDA approval of masks takes 18 to 24 months and requires capital investments.  Existing physician prescription practices also serve as a barrier to entry, as many states prohibit a DME or National Account from substituting a mask other than one prescribed.  In addition, the fact that most sleep apnea mask patients are already captive to a mask brand creates a barrier to entry, as much of the mask

market consists of existing patients demanding replacement masks who tend to resist a new mask brand, model, and fit.

26. Finally, ResMed's patent portfolio and litigation practice creates a barrier to entry. ResMed has approximately 1,321 United States patents and patent applications, many of which claim OSA masks.  ResMed aggressively asserts its patents against new entrants.  For example, shortly after 3B Medical began selling competing sleep apnea masks, ResMed filed a patent infringement case against 3B Medical and its supplier (BMC) in the United States District Court for the Southern District of California and filed an action in the International Trade Commission ("ITC") seeking to bar 3B Medical from importing BMC's competing masks into the United States.  ResMed alleged that 3B Medical (and BMC) infringed five mask patents.  Defending against ResMed's patent litigation cost in excess of $5 million.  The ITC found that 3B Medical's masks infringed a ResMed patent, and 3B Medical was barred from importing and selling the masks in the United States.

27. Similarly, shortly after a new entrant named Apex Medical Corp. ("Apex") (and its distributor) began selling competing sleep apnea masks in the United States, ResMed filed patent infringement cases in San Diego and within the ITC, alleging that Apex and its distributor infringed four mask patents.  Apex promptly stopped selling competing products in the United States and then started selling products domestically pursuant to a settlement agreement with ResMed.  In the early 2000s, ResMed filed patent cases against Respironics and Fisher-Paykel and entered into licensing agreements with the companies.

28. ResMed has market power in the sleep apnea mask market.  First, ResMed is able to profitably price its masks above supracompetitive levels.  For example, and as discussed further

below, ResMed has imposed price increases of up to 70% on its masks for customers that refuse to purchase all or virtually all of their flow generators from ResMed.  In addition, and upon information and belief, ResMed's masks are greater than 20% more expensive than the other competing masks.

29. Second, ResMed has at least a 70% share of the sleep apnea mask market.

30. Third, ResMed has the ability to exclude competitors from the market and diminish price competition.  For example, using its portfolio of approximately 1,321 United States patents and patent applications, ResMed successfully barred 3B Medical from importing sleep apnea masks. In addition, after advancing patent infringement claims against Respironics and Fisher Paykel, ResMed entered into licensing agreements with the organizations that, upon information and belief, include royalty rates that diminish price competition.  Upon information and belief, ResMed's settlement agreement with Apex also include royalty rates that diminish price competition.

31. Fourth, most of ResMed's customers are captive to ResMed and must continue to purchase masks from ResMed, even if faced with supracompetitive prices and/or a substantial price increase.  ResMed's customers serve patients who have been prescribed a ResMed mask and/or are comfortable with the ResMed mask fit, such that the patients will continue to demand from customers ResMed replacement masks even if ResMed raises (or maintains higher) prices to its customers.  Switching away from purchasing ResMed masks entails substantial risk from a customer and requires a substantial investment in capital, time, and effort.  Few customers serving patients committed to ResMed's masks are willing to take on the risk, capital expenditure, and effort necessary to switch away from ResMed masks.  For this reason, ResMed

can "shut down" customers that purchase competing low-cost flow generators, as articulated by a ResMed customer to a third-party analyst:  "We haven't tried 3B yet.  It's hard to switch to a low-cost provider because ResMed will shut down anyone who gets near their business."

32.  Because patients will continue to demand ResMed replacement masks (and component parts) even if ResMed raises prices, or maintains higher prices, to DMEs and National Accounts, the market for ResMed's replacement masks is an alternative market, or submarket, in which to assess ResMed's conduct. This market has substantial barriers to entry, as few, if any, ResMed customers serving patients using ResMed masks are willing to take on the risk, capital expenditure, and effort necessary to switch away from ResMed replacement masks. Accordingly, ResMed has the ability to dictate prices in this market, as evidenced by the fact that customers continue to purchase ResMed masks for their patients even though the masks are more than 20% more expensive than competing masks.  ResMed has a 100% share of this market.

***Sleep Apnea Flow Generator Market***

33.  Sleep apnea flow generators is a market in which to assess ResMed's conduct.  Flow generators include positive airway pressure devices, such as continuous positive airway pressure (CPAP) devices; auto adjusting positive airway pressure (APAP) devices; and bilevel positive airway pressure (BiPAP) devices; and adaptive servo-ventilator (ASV) devices.

34. Substantial barriers to entry exist in the flow generator market.  The FDA must approve flow generators, which takes 18 to 24 months and requires capital investments.  Moreover, ResMed's patent portfolio and litigation practice creates a barrier to entry.  ResMed aggressively asserts flow generator patents against new entrants.  For example, ResMed asserted a flow

generator patent against 3B Medical, which the ITC invalidated (after over $5 million in litigation defense costs in this case).

35. ResMed has market power in the flow generator market.  First, ResMed is able to price its flow generators at supracompetitive levels.  For example, ResMed's flow generator prices to DMEs are roughly 33% to 50% more expensive than 3B Medical's.

36. Second, ResMed has the ability to foreclose competition in the market.  For example, and as described further below, DMEs whose patients are largely captive to ResMed masks do not tend to consider low-cost flow generator suppliers such as 3B Medical, as ResMed threatens and imposes mask price increases on a DME's *entire patient base* if the DME refuses to purchase all or the vast majority (*e.g.*, 90%) of its sleep apnea products – including flow generators – from ResMed.  Considering that roughly 20 masks are sold for the five-year life cycle of a flow generator, a mask price increase on a DME's entire patient base for purchasing low-cost flow generators for new patients is financially coercive and encourages customers to avoid considering and purchasing low-cost flow generators, such as 3B Medical's products.  For this reason, and as articulated by a ResMed customer considering a 3B Medical flow generator, ResMed has the ability to "shut down" customers who would otherwise "switch to a low-cost provider."

37. Third, ResMed has a dominant share of the market.  As discussed further below, in addition to exclusive or de facto exclusive contracts with DMEs, ResMed recently entered exclusive contracts with National Account #1 and National Account #2, which together comprise 40% of sleep apnea product purchases.  Thus, going forward, and upon information and belief, ResMed's share of new flow generator sales will exceed 70%.

**RESMED'S ANTICOMPETITIVE CONDUCT**

38. 3B Medical started in 2010.  It sought FDA approval for its masks and flow generators, which took approximately two years to receive.  Over a period of six months, 3B Medical interviewed and hired about 35 individuals to market 3B Medical's products to DMEs.  3B Medical's management team served as the primary point of contact for National Accounts.  3B Medical launched its sleep apnea products in the United States on November 2012.

39. 3B Medical positioned itself as a low-cost distributor of masks and flow generators.  Upon information and belief, and based on pricing to DMEs, 3B Medical's flow generators and masks are roughly 33% to 50% less expensive than ResMed's.  3B Medical's low-cost entry into the markets coincided with the federal government's approximate 47% cut in Medicare reimbursement rates on sleep apnea products.  These severe cuts in Medicare reimbursement rates made 3B Medical's attempted entry into the markets with low-cost products timely, as customers were particularly price conscious.

40. 3B Medical's entry into the sleep apnea mask market was impacted by market barriers.  Many physicians prescribed ResMed's masks by name, limiting the ability of DMEs and National Accounts to substitute 3B Medical's lower-cost masks.  In addition, ResMed had a large and captive patient base who continued to demand ResMed replacement masks from DMEs and National Accounts, even though 3B Medical's masks were less expensive.  Then, the ITC barred 3B Medical from importing any of its competing masks altogether, requiring 3B Medical to redesign its masks.  Finally, ResMed entered and enforced exclusive or de facto exclusive contracts (discussed below), which created an additional barrier to 3B Medical's entry.

41. 3B Medical's entry into the flow generator market proved more fruitful.  While DMEs that purchased ResMed masks were generally not willing to consider 3B Medical's low-cost flow generators (as discussed further below), 3B Medical was able to generate interest among a subset of DMEs and National Accounts.  These customers trialed 3B Medical's products and were enthusiastic about a low-cost, quality flow generator alternative, as 3B Medical's flow generators were at least equal in quality to ResMed's.  The customers also valued that 3B Medical's products had a two-year warranty and that 3B Medical had a committed market presence, such that it would remain in the market for the long term to ensure it could service its flow generators and offer replacement parts, should the need arise.

42. For example, 3B Medical marketed its products to National Account #1, the largest National Account in the country.  National Account #1 maintained an "open formulary" that listed the flow generators that its offices throughout the country could purchase to serve sleep apnea patients.  At the time that 3B Medical started selling flow generators, ResMed, Respironics, and Fisher Paykel were all listed on National Account #1's formulary.  3B Medical's management met with National Account #1 for six months, supplied flow generators for trial purposes, and offered competitive prices for its flow generators.  National Account #1 liked the products, accepted the pricing, and listed 3B Medical's flow generators on its formulary.  National Account #1 started purchasing flow generators in the first quarter of 2013, quickly became 3B Medical's largest customer, and was satisfied with 3B Medical's flow generators and service.

43. From late 2012 through most of 2013, 3B Medical's sales grew each month, even though DMEs that purchased ResMed's masks generally continued to remain resistant to 3B Medical's

low-cost flow generators as a result of ResMed's anticompetitive practices. Moreover, 3B Medical's sales were substantially curtailed starting in the fall of 2013 also as a result of ResMed's anticompetitive practices. Two practices in particular foreclosed 3B Medical from a substantial share of the market.

44. First, ResMed entered and/or enforced exclusive or de facto exclusive contracts with customers, pursuant to which customers agreed to purchase all or the vast majority (*e.g.*, 90%) of their flow generators and masks from ResMed (hereafter "exclusive contracts"). Many of ResMed's exclusive contracts had a percentage purchase threshold of all sleep apnea purchases (including flow generators) that a customer had to satisfy in order to avoid a mask price increase – *e.g.*, 90% of a customer's sleep apnea purchases. Customers that refused to enter ResMed's exclusive contracts were threatened with substantial price increases – up to 70% – on ResMed's masks for the customers' *entire patient base*. Thus, if a customer required 4,000 ResMed replacement mask purchases a year and 200 replacement flow generator purchases a year to serve a patient base of 1,000 patients, it risked a substantial price increase on the 4,000 purchases of replacement masks unless it agreed to purchase the 200 replacement flow generators from ResMed.[2]

45. ResMed included in exclusive contracts a "Clipboarding" provision allowing a ResMed representative to audit customers' warehouses to ensure that the customers were purchasing all, or the vast majority, of their sleep apnea products from ResMed. Customers understood that

---

[2] Masks must be replaced every three months and flow generators must be replaced every five years. *See* ¶ 20. Accordingly, a patient base of 1,000 patients will require, on average, approximately 4,000 masks and 200 flow generators per year.

ResMed's exclusive contracts were designed to eliminate consideration and use of competing products – *e.g.*, 3B Medical's flow generators.

46. ResMed's exclusive contracts were implemented and enforced throughout the country and foreclosed 3B Medical from DMEs and National Accounts.  DMEs that purchased masks from ResMed generally were not willing to consider 3B Medical flow generators out of fear that ResMed would increase mask prices. 3B Medical learned of ResMed's coercive practices from a small subset of DME's willing to privately discuss ResMed.[3]  These DMEs were located throughout the country, were not isolated within a single ResMed territory or division, and complained of the same coercive practices, thereby reflecting the ubiquity of ResMed's practices.  For example, in 2013 and 2014, DMEs in Alabama, Connecticut, Florida, Georgia, and Texas complained that ResMed threatened the DMEs with mask price increases if they did not agree to purchase virtually all (*e.g.*, 90%) of their flow generators and masks from ResMed. These DMEs generally acceded to ResMed's purchase requirements, entered agreements with ResMed, and declined to purchase 3B Medical's less expensive flow generators.

47. Some potential customers spoke privately with 3B Medical and were less specific about ResMed's exclusive contracts, but – as a customer in Michigan said – were unwilling to trial 3B Medical's flow generators because "ResMed would find out and increase our mask prices."  This is the practice to which 3B Medical's potential customer was presumably referring when it told a third-party analyst that it could not "switch to a low-cost provider [such as 3B Medical] because ResMed will shut down anyone who gets near their business."

---

[3] 3B Medical does not provide the actual names of these DMEs in order to protect their identities from public disclosure.  DMEs have expressed a fear of retaliatory action by ResMed.

48. DME concern about mask price increases is well founded.  Upon information and belief, because approximately 20 masks are sold for every flow generator, 3B Medical could not reduce the prices of its flow generators enough to make up for ResMed's threatened increase in mask prices to DMEs even if 3B Medical gave away its flow generators for free.

49. Similarly, National Account interest in 3B Medical low-cost flow generators halted as a result of ResMed's exclusive contracts.  For example, National Account #1, which listed 3B Medical's flow generators on its formulary and was 3B Medical's largest customer in 2013, stopped purchasing 3B Medical's flow generators altogether and instead entered, in early 2014, an exclusive contract with ResMed.  3B Medical was removed from the account's formulary, as were other ResMed competitors.  Similarly, in the second half of 2014, 3B Medical had been meeting with National Account #2 hoping to be listed on the account's formulary and supply it with flow generators.  After multiple meetings and interest in 3B Medical's low-cost offering, National Account #2 entered an exclusive contract with ResMed at the beginning of 2015 and was no longer interested in 3B Medical's flow generators.

50. Thus, by early 2015, ResMed had entered exclusive contracts with the country's two largest National Accounts, comprising 40% of all new flow generator purchases.  These two contracts, coupled with ResMed's DME practices (described in Paragraphs 44-48), have foreclosed 3B Medical from most of the flow generator market.

51. Second, shortly after filing its patent claims against 3B Medical and BMC, ResMed instituted a coordinated campaign with its sales force to falsely inform customers willing to consider 3B Medical's flow generators that, as a result of the litigation, 3B Medical would soon be out of business, such that it would not be able to honor two year warranties or otherwise

16

service flow generators.  For example, ResMed's sales force falsely informed customers that:  (a) 3B Medical would not be in business for another six months; (b) that injunctive relief had been entered preventing 3B Medical from importing flow generators into the United States; (c) once 3B Medical's existing inventory of flow generators was sold, it would no longer be in business; and (d) that ResMed was going to put 3B Medical out of business.

52. In 2013 and 2014, ResMed's aggressive assertion of intellectual property claims was generally known in the industry.  Accordingly, 3B Medical's existing and prospective customers viewed ResMed's misinformation as credible and were concerned about 3B Medical's ability to honor a two year warranty on flow generators and otherwise service the products.  As a result, customers limited, stopped, or refused to consider flow generator purchases from 3B Medical.

### ANTICOMPETITIVE EFFECTS

53. ResMed's anticompetitive conduct has resulted in at least five anticompetitive effects. First, ResMed's practices have led to higher prices.  For example, ResMed's exclusive contracts have prevented customers from purchasing 3B Medical's flow generators, even when the flow generators are up to 33 to 50% less expensive than ResMed's competing products.  Similarly, ResMed's threat to increase mask prices if a customer purchases 3B Medical's low-cost flow generators has precluded customers from considering 3B Medical's products.  For example, if a DME purchases around 4,000 ResMed masks a year to service the mask replacement needs for its patients, it is economically prohibitive for the DME to risk a price increase on all of these mask purchases simply to save 33 to 50% on approximately 200 flow generator purchases a year. On average, a ResMed mask costs roughly 25% to 40% of a 3B Medical flow generator.  For this reason, and as articulated by a ResMed customer, ResMed has the ability to "shut down" a DME

that "gets near" 3B Medical.  Finally, ResMed successfully discouraged purchases of 3B Medical's low-cost flow generators on the basis that 3B Medical had already been, or would be, forced out of the market.

54. Second, ResMed's practices have foreclosed 3B Medical from a substantial share of the flow generator market.  Specifically, as a result of ResMed's exclusive contracts and practices, DMEs that purchased ResMed masks and supplied the masks to their patients generally were not willing to consider 3B Medical's low-cost flow generators.  While National Account #1 and National Account #2 were interested in 3B Medical's flow generators in 2013 and 2014, ResMed's exclusive contracts with the customers foreclosed 3B Medical from competing for this business.

55. Third, ResMed's practices have created additional barriers to entry in the flow generator market.  For example, ResMed's exclusive contracts and threats of price increases on ResMed masks for customers that purchase 3B Medical's competing flow generators, have enabled ResMed to increase its own share of the relevant market and made it extremely difficult for any new entrant to enter the market.

56. Fourth, ResMed's practices have allowed it to dictate the National Account and DME "winners and losers" in the Center for Medicare & Medicaid Services ("CMS") competitive bidding process.  CMS requires sleep apnea product distributors to competitively bid to be selected to supply (and be reimbursed for) masks and flow generators to Medicare and Medicaid sleep apnea patients, which represent a substantial percentage (*e.g.*, over 25%) of the domestic sleep apnea population.  ResMed's anticompetitive practices have led to differential pricing for masks and flow generators:  upon information and belief, some preferred exclusive ResMed

customers – *e.g.*, the National Account customers – receive better pricing for masks and flow generators compared to other ResMed non-preferred customers.  ResMed's preferred customers are better positioned to compete for and win the CMS business compared to the non-preferred customers.  By dictating which preferred customers are best positioned to win the CMS bids, ResMed risks altering the DME and National Account landscape.  For example, if a DME is unable to compete on bids for a substantial portion of the sleep apnea patient population, it may be unable to survive long-term.

57. Finally, ResMed's sales tactics have created an environment of fear and bullying among customers, making many customers fearful of retaliatory action by ResMed if they purchase – or even consider – 3B Medical low-cost flow generators.  These sales tactics limit choice and competition in the markets for sleep disordered breathing products.

## Count I – Contracts in Restraint of Trade & Exclusive Dealing
**(Violation of Sherman Act Section 1, 15 U.S.C. § 1, Clayton Act Section 3, 15 U.S.C. § 14, <u>and Florida Antitrust Act of 1980, Fla. Stat. § 542.18)</u>**

58. 3B Medical repeats and realleges each and every allegation set forth above.

59. ResMed has market power in both the sleep apnea mask market and the flow generator market.

60. As described above, ResMed has entered into and enforced exclusive or de facto exclusive contracts with DMEs and National Accounts throughout the country, pursuant to which these DMEs and National Accounts agreed to purchase all or the vast majority (*e.g.*, 90%) of their flow generators and masks from ResMed.  Customers who fail to enter into these exclusive contracts face substantial price increases – up to 70% – on ResMed's masks.

61. Competition in the flow generator market as a whole has been substantially lessened by ResMed's exclusive dealing. As described above, this damage to competition manifests itself in different ways which include but are not limited to: (a) customers paying higher prices for flow generators, (b) foreclosure of 3B Medical from a substantial share of the flow generator market, (c) the creation of additional barriers to entry in the flow generator market, (d) ResMed being able to dictate "winners and losers" in competitive CMS bidding, and (e) a culture of fear of bullying and retaliation among customers that consider or purchase 3B Medical flow generators, thereby discouraging customers from purchasing 3B Medical low-cost flow generators.

62. 3B Medical and competition in the flow generator market has been, and is continuing to be, damaged by ResMed's anticompetitive actions. If unabated by this Court, ResMed's actions will continue to cause increasing anticompetitive harm to 3B Medical and the flow generator market.

**Count II – Monopolization**
**(Violation of Sherman Act Section 2, 15 U.S.C. § 2, and**
**Florida Antitrust Act of 1980, Fla. Stat. § 542.19)**

63. 3B Medical repeats and realleges each and every allegation set forth above.

64. ResMed possesses monopoly power in the market for the sale of flow generators in the United States. ResMed has the ability to price its flow generators at supracompetitive levels, has the ability to foreclose competition in the market, and has (upon information and belief) greater than a 70% share of flow generator purchases.

65. ResMed willfully and wrongfully obtained and/or is maintaining its monopoly in the flow generator market by engaging in the anticompetitive conduct described above.

66. The anticompetitive effects of ResMed's conduct far outweigh any purported competitive justifications.   Similarly, there are no legitimate business justifications for ResMed's anticompetitive actions.   To the extent that there are any legitimate business reasons for ResMed's anticompetitive actions, they are not the least restrictive means of achieving those business purposes.   Any claimed pro-competitive business reasons for ResMed's anticompetitive actions are outweighed by the competitive harm that they have caused, and will cause, to competition in the relevant market.

67. 3B Medical and competition in the flow generator market has been, and is continuing to be, damaged by ResMed's anticompetitive actions.   If unabated by this Court, ResMed's actions will continue to cause increasing harm to 3B Medical and the flow generator market.

**Count III – Unlawful Tying**
**(Violation of Sherman Act Section 1, 15 U.S.C. § 1, and**
**Florida Antitrust Act of 1980, Fla. Stat. § 542.18)**

68. 3B Medical repeats and realleges each and every allegation set forth above.

69. Sleep apnea flow generators and masks, as described above, are separate products.

70. ResMed has market power in the sleep apnea mask markets.   Masks constitute the tying product in ResMed's anticompetitive scheme to exclude competition from the flow generator market.

71. ResMed has increased its share of the flow generator market by tying the purchase of ResMed's flow generators to the purchase of ResMed's masks.   Customers who fail to purchase all or the vast majority (*e.g.*, 90%) of their flow generators and masks from ResMed, face substantial price increases – up to 70% – on ResMed's masks.   In this way, customers are

coerced into purchasing both masks and flow generators from ResMed, despite the availability of an alternative, lower cost flow generator from 3B Medical.

72. ResMed's conduct affects a substantial amount of interstate commerce in the flow generator market, comprising numerous transactions, which have value in the millions of dollars.

73. Competition in the flow generator market as a whole is substantially lessened by ResMed's illegal tying activities.  As described above, this damage to competition manifests itself in different ways which include but are not limited to:  (a) customers paying higher prices for flow generators, (b) foreclosure of 3B Medical from a substantial share of the flow generator market, (c) the creation of additional barriers to entry in the flow generator market, (d) ResMed being able to dictate "winners and losers" in competitive CMS bidding, and (e) a culture of fear of bullying and retaliation among customers that consider or purchase 3B Medical flow generators, thereby discouraging customers from purchasing 3B Medical low-cost flow generators.

74. 3B Medical and competition in the flow generator market has been, and is continuing to be, damaged by ResMed's anticompetitive actions.  If unabated by this Court, ResMed's actions will continue to cause increasing anticompetitive harm to 3B Medical and the flow generator market.

### Count IV – Attempted Monopolization
### (Violation of Sherman Act Section 2, 15 U.S.C. § 2, and
### Florida Antitrust Act of 1980, Fla. Stat. § 542.19)

75. 3B Medical repeats and realleges each and every allegation set forth above.

76. ResMed has willingly and purposefully engaged in a pattern of anticompetitive conduct, described above, designed to monopolize the flow generator market.

22

77. ResMed's actions, described above, manifest a specific intent to monopolize (and thereby eliminate competition) in the flow generator market.

78. Given ResMed's actions in the flow generator market, substantial presence in the flow generator market (*e.g.*, a greater than 70% share of the market), and intent to limit competition in the flow generator market, there is a dangerous probability that, left unchecked, ResMed will effectively monopolize the flow generator market, to the extent a jury finds that it has not already monopolized the market.

79. 3B Medical and competition in the flow generator market has been, and is continuing to be, damaged by ResMed's anticompetitive actions. If unabated by this Court, ResMed's actions will continue to cause increasing harm to 3B Medical and the flow generator market.

### Count V – Tortious Interference with Business Relationship or Expectancy

80. 3B Medical repeats and realleges each and every allegation set forth above.

81. 3B Medical, as described above, has – or had – a business relationship with numerous DMEs and National Accounts to which 3B sells flow generators.

82. 3B Medical, as described above, has a reasonable business expectancy with numerous of other DMEs and National Accounts to which 3B Medical has sought, or seeks, to sell flow generators.

83. ResMed is, and at all pertinent times was, aware of the relationship and/or expectancy between 3B Medical and these DMEs and National Accounts

84. ResMed intentionally, unlawfully, and without justification interfered with the relationship between 3B Medical and these DMEs and National Accounts by the acts described above.

85. The actions of ResMed caused independent companies to terminate or alter their business relationship or expected relationship with 3B Medical.

86. Customers or potential customers of 3B Medical who have purchased or would otherwise purchase 3B Medical flow generators have been unlawfully coerced or duped by ResMed to purchase ResMed's flow generators instead.

87. The termination of these business relationships and expectancies has caused, and continues to cause, significant financial harm to 3B Medical.

88. Because of the knowing, malicious, or reckless nature of its conduct, ResMed is liable for punitive damages.

### Count VI – Unfair Competition
### (Violation of Florida Deceptive and Unfair Trade Practices Act, Fla. Stat. § 501.201, *et seq.*)

89. 3B Medical repeats and realleges each and every allegation set forth above.

90. ResMed is engaged in commerce in and affecting the state of Florida, through their sales and distribution of sleep apnea masks and flow generators.

91. ResMed, through the actions described above, has engaged in unfair and deceptive trade practice, as that term is defined in the Florida Deceptive and Unfair Trade Practices Act, Fla. Stat. § 501.201, *et seq.* Specifically, ResMed's actions are anticompetitive, unethical, and oppressive.

92. ResMed's actions, described above, have caused, and continue to cause, significant damage to 3B Medical in the form of lost sales and profits.

93. ResMed's actions, if unabated by this Court, pose the dangerous risk of continued harm to the competitive market.

## PRAYER FOR RELIEF

WHEREFORE, 3B Medical respectfully requests that the Court adjudge and decree that:

a.  ResMed engaged in unlawful acts in violation of Sections 1 and 2 of the Sherman Act, Section 3 of the Clayton Act, the Florida Antitrust Act of 1980, and/or the statutory and common law of Florida;

b.  3B Medical be awarded actual damages, including, without limitation, lost profits;

c.  3B Medical be awarded threefold damages (or the maximum amount of damages available under applicable law) that it is determined to have sustained, pursuant to Section 4 of the Clayton Act, 15 U.S.C. § 15, the Florida Antitrust Act of 1980, Fla. Stat. § 542.22, and/or the statutory and common law of Florida;

d.  3B Medical be awarded punitive damages;

e.  3B Medical be awarded pre- and post-judgment interest on any actual, threefold, and/or punitive damages award;

f.  3B Medical recover its costs of suit, including reasonable attorneys' fees and costs as provided by law;

g.  ResMed be required to disgorge any profits gained by the unlawful conduct;

h.  ResMed be enjoined from continuing its anticompetitive conduct;

i.  3B Medical be awarded any other appropriate relief as the Court deems just, equitable, and proper.

## JURY DEMAND

Pursuant to Rule 38, of the Federal Rules of Civil Procedure, Plaintiff respectfully demands trial by jury on all issues properly triable by a jury in this action.

Respectfully submitted, this 11th day of March, 2015.

/s/James J. McGuire
James J. McGuire
  Florida Bar No. 187798
THOMAS & LOCICERO PL
601 S. Boulevard
Tampa, FL 33606
(813) 984-3062
(813) 984-3070 (fax)
jmcguire@tlolawfirm.com

Daniel Kotchen (*pro hac vice* forthcoming)
Daniel Low (*pro hac vice* forthcoming)
Michael von Klemperer
        (*pro hac vice* forthcoming)
KOTCHEN & LOW LLP
1745 Kalorama Road NW, Suite 101
Washington, D.C. 20009
(202) 471-1995
(202) 280-1128 (fax)
dkotchen@kotchen.com
dlow@kotchen.com
mvk@kotchen.com

Attorneys for Plaintiff 3B Medical, Inc.